[Cite as *State v. Jones*, 2013-Ohio-654.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY


| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | CASE NO. CA2012-04-077 |
| | : | O P I N I O N |
| - vs - | | 2/25/2013 |
| | : | |
| RICHARD J. JONES, | : | |
| Defendant-Appellant. | : | |


CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR2011-1722


Michael T. Gmoser, Butler County Prosecuting Attorney, Michael A. Oster, Jr., Government Services Center, 315 High Street, 11th Floor, Hamilton, Ohio 45011, for plaintiff-appellee

Scott A. Blauvelt, 246 High Street, Hamilton, Ohio 45011, for defendant-appellant


**PIPER, J.**

{¶ 1}   Defendant-appellant, Richard Jones, appeals his conviction and sentence in the Butler County Court of Common Pleas for aggravated murder.

{¶ 2}   In May 2011, Richard Jones, Jr. moved in with his 72-year-old father, Richard Jones, Sr. (Richard), in order to help him recover from a recent stroke and surgery.  Jones and his father had a tumultuous relationship, and the two frequently argued.  On October 1, 2011, the two had another argument, with Richard accusing Jones of littering the yard with

beer cans while "partying" with friends. The two men continued their argument at the local Rally's drive-through restaurant, where they had gone to get food. Richard told Jones that he was no longer welcome in the home they shared, or in his life. Jones got out of his father's car and began walking back toward the house he shared with this father, but ultimately went to the house of an aunt who lived nearby.

{¶ 3} At approximately 3:00 p.m., Richard called police to report the argument, and asked an officer to come to his home. While Jones was at his aunt's house, he called his father, and learned that Richard had called police and an officer was at the house listening to Richard's complaints regarding the argument and regarding Jones.

{¶ 4} During the phone conversation with his father, Jones asked to speak to the officer, Elizabeth Stewart. Jones asked Officer Stewart if he could come to the house in order to retrieve his personal property. Officer Stewart permitted Jones to come to the house in order to retrieve his belongings, and stayed there until he did so. After retrieving his belongings, Jones went to a bar and consumed alcohol, then later purchased beer and went to a local park where he continued to consume alcohol.

{¶ 5} While Jones was intoxicated, he made several phone calls to Richard, and to police dispatch regarding his assertion that Richard threatened to kill him during the 3:00 phone call before Jones spoke with Officer Stewart. Unbeknownst to Jones, the phone calls were recorded, even when Jones was placed on a hold. During the hold, Jones can be heard saying, "I'm gonna kill him * * * I will kill my father because I can, the prick * * * He's a dead man * * * I'm gonna kill him * * * He needs to die * * * We'd all be better off * * *." Jones also called Richard several times directly, and threatened his life. Richard then called police dispatch, and over the course of multiple calls that night, indicated that Jones threatened his life. Richard expressed his fear that Jones was going to kill him, and asked officers to check on his house periodically throughout the night. Officer Stewart later returned to the house

around 9:30 p.m. regarding the additional string of threatening phone calls between Jones and Richard; however, Jones did not appear at the house, and she left after speaking with Richard.

{¶ 6} Sometime after 10:30 p.m., Jones returned to the house he shared with Richard in order to retrieve a piece of mail related to his Social Security Disability benefits. Jones did not see his father's car in the drive, and later stated that he assumed that his father was not there. Jones was unable to unlock the back door, and instead, kicked it in in order to gain access to the house. Once inside, Jones discovered that Richard was in the house. At 10:39 p.m., a call was placed to 911 from inside the house. The call lasted only seconds, during which a scuffle is heard before the call ends.

{¶ 7} According to Jones' rendition of the events once he kicked in the door, Richard came at him with a knife and Jones pushed him out of the way using a straight-arm push to Richard's head. Jones then went upstairs to retrieve his mail. Jones stated that once he was upstairs, he got something to drink and sat on the couch. At that point, Richard came at Jones with a knife in one hand and a fireplace poker in the other, and the two engaged in an altercation. During the altercation, Jones hit his father in the head, strangled him, stabbed him in the neck with the knife Richard supposedly wielded against Jones, and also kicked Richard in the chest/neck/head area. Jones stated that he remembers only pulling the knife from Richard's neck, and that he must have placed the bloody knife in the kitchen sink and washed his hands after killing his father.

{¶ 8} Twenty-two minutes after the brief 911 call, police dispatch sent officers to Richard's home. At 11:00 p.m., Officer Andrew Kaylor arrived at Richard's house and noticed movement inside the house. Officer Kaylor knocked on the door, but did not receive an answer. Officer Kaylor's backup, Officer Shelley Meehan, saw Jones coming to the back door near the garage, and called Officer Kaylor to the back to investigate. The officers saw

- 3 -

that Jones had blood on his chin. When the officers asked Jones whose blood was on his face, Jones told them that he "got into it" with his father and that Richard was likely dying inside the home.

{¶ 9} Officers Kaylor detained Jones while Officer Meehan went inside the home. There, he found Richard dead in the living room. Officers located a shoe print on the door, saw that the door frame was splintered, and located a broken hinge on the floor, all indicating that Jones kicked in the door. Officers then noticed that the same shoe print was imprinted with blood on Richard's shirt on the upper left hand side of his chest and near his face. Jones was arrested and given his *Miranda* rights, and gave a 90-minute confession at the police station.

{¶ 10} The autopsy revealed that three types of injuries led to Richard's death, blunt force trauma to the face and jaw, manual strangulation, and stab wounds to the neck. While any or all of the injuries could have caused death, the corner concluded that the most likely chain of events started with Jones striking Richard in the face, strangling him, stabbing him in the neck, and then stomping on Richard's chest/head/neck area when Richard was near death.

{¶ 11} Jones was arrested and charged with aggravated murder, with the state alleging that Jones performed the murder with prior calculation and design. Jones pled not guilty, and later changed his plea to not-guilty by reason of insanity. The trial court ordered an evaluation of Jones' legal sanity and competency to stand trial. Jones was found competent to stand trial, and he withdrew his insanity plea and re-entered his not guilty plea. The matter proceeded to a three-day jury trial. While Jones did not deny that he killed his father, he asserted that he had not done so with any prior calculation and design. However, the jury found Jones guilty of aggravated murder, and the trial court sentenced him to 25 years to life in prison. Jones now appeals his conviction and sentence raising the following

- 4 -

assignments of error. For ease of discussion, we will combine some assignments for analysis purposes.

{¶ 12}Assignment of Error No. 1:

{¶ 13}THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT A CONVICTION FOR AGGRAVATED MURDER.

{¶ 14}Assignment of Error No. 2:

{¶ 15}THE GUILTY VERDICT FOR AGGRAVATED MURDER WAS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 16}Jones argues in his first and second assignments of error that his conviction is against the manifest weight of the evidence and is not supported by sufficient evidence.

{¶ 17}Manifest weight and sufficiency of the evidence are quantitatively and qualitatively different legal concepts. *State v. Thompkins,* 78 Ohio St.3d 380, 386 (1997). When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence in order to determine whether such evidence, if believed, would support a conviction. *State v. Wilson,* 12th Dist. No. CA2006-01-007, 2007-Ohio-2298. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks,* 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, superseded on other grounds.

{¶ 18}While the test for sufficiency requires an appellate court to determine whether the state has met its burden of production at trial, a manifest weight challenge examines the inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other. *Wilson,* 2007-Ohio-2298.

> In determining whether a conviction is against the manifest weight of the evidence, the court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers

- 5 -

the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Cummings*, 12th Dist. No. CA2006-09-224, 2007-Ohio-4970, ¶ 12.

{¶ 19}While appellate review includes the responsibility to consider the credibility of witnesses and weight given to the evidence, "these issues are primarily matters for the trier of fact to decide since the trier of fact is in the best position to judge the credibility of the witnesses and the weight to be given the evidence." *State v. Walker*, 12th Dist. No. CA2006-04-085, 2007-Ohio-911, ¶ 26. Therefore, an appellate court will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances to correct a manifest miscarriage of justice, and only when the evidence presented at trial weighs heavily in favor of acquittal. *Thompkins*, 78 Ohio St.3d at 387.

{¶ 20}"Because sufficiency is required to take a case to the jury, a finding that a conviction is supported by the weight of the evidence must necessarily include a finding of sufficiency. Thus, a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." *Wilson*, 2007-Ohio-2298 at ¶ 35, citing *State v. Lombardi*, 9th Dist. No. 22435, 2005-Ohio-4942, fn. 4.

{¶ 21}Jones was charged with and convicted of aggravated murder in violation of R.C. 2903.01(A), which provides, "no person shall purposely, and with prior calculation and design, cause the death of another or the unlawful termination of another's pregnancy." According to R.C. 2901.22(A), "a person acts purposely when it is his specific intention to cause a certain result * * *."

{¶ 22}"There is no bright-line test to determine whether prior calculation and design are present, and 'each case must be decided on a case-by-case basis.'" *State v. Adams*, 12th Dist. No. CA2009-11-293, 2011-Ohio-536, ¶ 23 quoting *State v. Braden,* 98 Ohio St.3d

354, 2003-Ohio-1325, ¶ 61.

> Where evidence adduced at trial reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified.

*Braden* at ¶ 61, quoting *State v. Cotton*, 56 Ohio St.2d 8 (1978), paragraph three of the syllabus.

{¶ 23} Some factors to be considered in determining the existence of prior calculation and design include:

> (1) whether the accused and victim knew each other, and, if so, whether their relationship was strained, (2) whether the accused gave thought or preparation to choosing a murder weapon or murder site, and (3) whether the act was drawn out as opposed to being an almost instantaneous eruption of events. A finding that these circumstances existed supports the conclusion that the crimes were committed with prior calculation and design.

*Braden* at ¶ 62, citing *State v. Taylor,* 78 Ohio St.3d 15, 19 (1997).

{¶ 24} During trial, the jury heard evidence that Jones killed his father with prior calculation and design. The state presented evidence that reveals the presence of sufficient time and opportunity for the planning of the murder. The state introduced recorded telephone calls from Jones and Richard which demonstrated that hours before the homicide, Jones was already planning on killing his father. The recorded phone calls indicated that Jones, himself, stated, "I'm gonna kill him," "I will kill my father because I can, the prick," and "He's a dead man." Jones can also be heard stating that Richard was "a dead man" and that "he needs to die. We'd all be better off * * *." Richard's phone calls to police also indicate that Jones called Richard multiple times in order to threaten his life, and to express Jones' intention to kill Richard. The threats were so real to Richard that he asked police to check on his house during the night, in fear for his life. These statements made hours before the

incident indicate that Jones was planning his father's death hours before the murder actually occurred.

{¶ 25} The jury also heard evidence that the circumstances surrounding the homicide show a scheme designed to implement Jones' calculated decision to kill Richard. The state presented evidence that Jones kicked in the door to Richard's house and entered the home. Once inside, he straight-armed and pushed Richard, and then engaged in several actions that led to Richard's death. The coroner testified that Richard died from a combination of injuries including blunt force trauma, manual strangulation, and stab wounds to the neck. The jury heard evidence that Jones struck Richard in the head and that he then began strangling his father. Jones then stabbed Richard in the neck twice, and then kicked Richard's chest/neck/face area with this foot.[1]

{¶ 26} The coroner also testified that Richard was still alive for "a while" after the initial attack began, as evidenced by the presence of blood in his heart and fluid in his lungs. The coroner indicated that the likely chain of events started with Jones striking Richard on the face, then strangling him. When Richard was near death, but still alive, Jones stabbed him and kicked him in the chest and face area.

{¶ 27} The distinct actions that led to Richard's death required separate thought processes on Jones' part to first violently hit Richard in the head, *then* strangle him, *then* stab him, *then* stomp on his chest, neck and face. In between each action, Jones took additional time to contemplate his next move and decide upon the next deadly action in order to carry out his calculated plan to kill his father. Simply stated, this was not a "spur-of-the-moment accidental" death. *See State v. Goodwin*, 84 Ohio St.3d 331, 344 (1999) (finding prior

---

1. Richard's jaw was fractured, and the jaw bone penetrated into the oral cavity and through the skin so that his jaw bone was sticking into his mouth. The corner concluded that there was "considerable force applied to his jaw," and indicated that it was possible the force was consistent with being "stomped" on.

calculation and design because the murder was not a "spur-of-the-moment accidental" death where a robber pointed his gun at a store cashier and then decided to pull the trigger once the cashier's hands were above his head).

{¶ 28}Moreover, we find that the factors listed by the Ohio Supreme Court in *Braden* as being indicative of prior calculation and design are also met. First, Jones and Richard obviously knew each other, and their relationship was heavily strained. Jones presented evidence at trial that Richard was an abusive father who had a history of violence toward family members. The jury also heard evidence that Richard continually berated Jones for Jones' alcohol consumption, especially on the day of the murder. The record also contains a plethora of evidence that Jones carried an on-going and deep-seeded anger toward his father, and that Richard demonstrated equal contempt for his son.[2]

{¶ 29}Secondly, the record indicates that Jones gave thought and preparation to choosing a murder weapon and murder site. The jury heard evidence that Jones waited until nearly 11:00 p.m. to force entry in the house. He then hit his father, manually strangled his father, and then used a knife to stab Richard in the neck.

{¶ 30}Lastly and as previously discussed, the murder was drawn out as opposed to being an almost instantaneous eruption of events. The coroner testified that Richard's death was not instantaneous, and was instead, drawn out over a period of time, and based upon a chain of events that included strangulation, stab wounds, and stomping.

{¶ 31}It is readily apparent from these facts that sufficient time, reflection, and acts were involved to establish that Jones purposely and with prior calculation and design, caused the death of his father. Having found that Jones' conviction for aggravated murder is supported by sufficient evidence and is not against the manifest weight of the evidence, his

---

2. The record contains evidence that Richard made several death threats to Jones in the past, and on at least one occasion, ran over Jones with his car.

first and second assignments of error are overruled.

{¶ 32}Assignment of Error No. 3:

{¶ 33}THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT AND ABUSED ITS DISCRETION IN DECLINING TO PROVIDE JURY INSTRUCTIONS, IN VIOLATION OF HIS RIGHT TO A JURY TRIAL UNDER THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION  5 OF THE OHIO CONSTITUTION.

{¶ 34}Jones argues in his third assignment of error that the trial court erred in not giving a jury instruction on the lesser included offense of murder, the inferior degree offense of voluntary manslaughter, and the affirmative defense of self-defense.

{¶ 35}We review the trial court's decision on requested jury instructions for an abuse of discretion. *State v. Gray*, 12th Dist. No. CA2010-03-064, 2011-Ohio-666, ¶ 23. An abuse of discretion connotes more than an error in law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *State v. Barnes,* 94 Ohio St.3d 21, 23 (2002).

{¶ 36}Regarding murder and voluntary manslaughter, "even though an offense may be statutorily defined as a lesser included offense of another, a charge on the lesser included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense." *State v. Taylor*, 50 Ohio St.3d 24, 36 (1990), superseded by statute on other grounds. In making this determination, the trial court must consider the evidence in a light most favorable to the defendant. *State v. Platt,* 12th Dist. No. CA2011-08-146, 2012-Ohio-5240, ¶ 21.

{¶ 37}When the "evidence presented at trial does not meet this test, a charge on the lesser included (or inferior-degree) offense is not required." *State v. Shane*, 63 Ohio St.3d 630, 632 (1992). An instruction is not warranted simply because the defendant offers "some

evidence" to establish the lesser included/inferior charge. *Id.*

{¶ 38}Jones first requested an instruction on murder. According to R.C. 2903.02(A) "no person shall purposely cause the death of another or the unlawful termination of another's pregnancy." The difference between murder and aggravated murder is whether there existed prior calculation and design. Therefore, an instruction on murder would have been proper in this case *only if* the jury could reasonably have found that Jones purposely killed Richard but did not do so with prior calculation and design.

{¶ 39}Given our determination in Jones' first and second assignments of error that Jones killed his father with prior calculation and design, we cannot say that the trial court abused its discretion in denying Jones' request to instruct the jury on murder. The evidence was clear that Jones demonstrated his intent to kill his father by making threats hours before the killing, and that his actions on the night of the murder indicated prior calculation and design by way of his forcing his way into the house, striking, strangling, stabbing, and stomping his father to death. Therefore, we cannot say that the jury could have reasonably found that Jones killed Richard, but did so without prior calculation and design.

{¶ 40}Jones next requested a jury instruction on voluntary manslaughter. According to R.C. 2903.03, "no person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another or the unlawful termination of another's pregnancy." According to the Ohio Supreme Court,

> an objective standard must be applied to determine whether the alleged provocation is reasonably sufficient to bring on a sudden passion or fit of rage. That is, the provocation must be "sufficient to arouse the passions of an ordinary person beyond the power of his or her control." If this objective standard is met, the inquiry shifts to a subjective standard, to determine whether the defendant in the particular case "actually was under the influence

- 11 -

of sudden passion or in a sudden fit of rage."

*State v. Mack*, 82 Ohio St.3d 198, 201 (1998), quoting *Shane* at 634-635.

{¶ 41}Therefore, before Jones was entitled to a jury instruction on voluntary manslaughter, the trial court must have first determined that there was sufficient evidence to establish that Jones acted with sudden passion or a sudden fit of rage brought on by serious provocation from Richard that was reasonably sufficient to incite Jones into using deadly force.

{¶ 42}The facts deduced at trial negate the idea that Jones acted with sudden passion or in a sudden fit of rage provoked by Richard. Instead, Jones made multiple threatening phone calls hours before the murder, and the argument that led to the police initially being called occurred approximately eight hours before the murder. Moreover, the precipitating events that led to Jones' anger that day and night occurred over the course of Jones' life, as Richard's abuse and berating behavior toward Jones began when Jones was a child and continued throughout Jones' life.

{¶ 43}While Richard may not have had a positive relationship with his son, there is no indication in the record that he did anything in the moments before his death to provoke or incite Jones into using deadly force. Any ill words spoken between father and son, whether during their phone calls to one another on the night of the murder or during a life-long abusive relationship, do not rise to the level of sufficient provocation where Jones had sufficient time to "cool off" before, during, and after he walked to Richard's house that night. *See Mack* at 201(finding that "past incidents or verbal threats do not satisfy the test for reasonably sufficient provocation when there is sufficient time for cooling off").

{¶ 44}Moreover, even if Richard did or said something to incite Jones upon Jones entering the house, Jones had sufficient time to cool off before he killed his father. By his own testimony, Jones stated that once he straight-armed Richard and knocked his father

- 12 -

down, he went upstairs, got something to drink, and sat on the couch. This time period was sufficient to allow Jones to reflect upon the moment and take an action other than killing Richard. However, Jones chose to hit his father, then strangle him, then stab him, then kick him. As the occurrences were not instantaneous, there were moments before and during the violent assaults where Jones could have stopped and abandoned his attempt to kill his father. However, Jones did not abandon that attempt, and instead, continued through three different processes in order to obtain his ultimate goal: the death of his father. Based on the evidence deduced at trial, Jones could not meet the objective or subjective standards set forth by the Ohio Supreme Court, and a voluntary manslaughter instruction was not warranted.

{¶ 45}Regarding self-defense, the burden of going forward with evidence of self-defense and the burden of proving self-defense by a preponderance of the evidence is upon the accused. R.C. 2901.05(A); *State v. Palmer,* 80 Ohio St.3d 543, 563 (1997).

> To establish self-defense in a case where a defendant used deadly force, the defendant must prove: (1) he was not at fault in creating the situation giving rise to the affray; (2) he had a bona fide belief he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was the use of deadly force; and (3) he did not violate any duty to retreat or avoid the danger.

*Gray*, 2011-Ohio-666 at ¶ 43, citing *State v. Robbins*, 58 Ohio St.2d 74 (1979), paragraph two of the syllabus. If a defendant fails to prove any one of these elements, he has failed to demonstrate he acted in self-defense. *State v. Voss,* 12th Dist. No. CA2006-11-132, 2008-Ohio-3889, ¶ 54.

{¶ 46}The trial court did not abuse its discretion in refusing to give the jury an instruction on self-defense. Instead, the evidence elicited at trial indicated that Jones was at fault for creating the situation giving rise to the affray in that he purposefully went to Richard's house that night. Although the door was locked from the inside, clearly indicating Richard's

intention to keep Jones out of the house, Jones kicked in the door to gain access to the house.

{¶ 47}Nor did Jones have a bona fide belief that he was in imminent danger of death or great body harm if he did not use deadly force against Richard. The record is clear that Richard was a 72-year-old man who had recently returned home from a multi-month stay at the hospital after surgery and a stroke. Richard's weight had dropped to 175 pounds by the time of his death, whereas Jones stood 6'8" and weighed 260 pounds. Jones' own testimony revealed that he had been able to straight-arm Richard with ease and knock Richard aside as soon as Jones entered the house. Even if Richard had been holding a knife or fireplace poker as indicated by Jones, pushing his father aside demonstrates that Jones was able to easily overcome Richard without resorting to deadly force. The evidence also showed that Jones was not in any fear for his life, as he went upstairs, got a drink, and sat on the couch while Richard recovered from the downstairs push and joined Jones on the main level of the house. Had Jones feared for his life, it would be reasonable to assume that he would call police or flee the house rather than sitting on the couch with a beverage.

{¶ 48}Jones failed to demonstrate that he acted in self-defense on the night he killed his father, and the trial court did not abuse its discretion in not instructing the jury on self-defense. Having found that Jones was not entitled to jury instructions on murder, voluntary manslaughter, or self-defense, Jones' third assignment of error is overruled.

{¶ 49}Assignment of Error No. 4:

{¶ 50}THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT IN THE ADMISSION OF PREJUDICIAL HEARSAY EVIDENCE.

{¶ 51}Assignment of Error No. 5:

{¶ 52}APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL, IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED

STATES CONSTITUTION AND SECTION 10, ARTICLE I OF THE OHIO CONSTITUTION, WHICH DENIAL RESULTED IN PREJUDICE.

{¶ 53}Jones argues in this fourth assignment of error that the trial court erred by admitting inadmissible hearsay evidence during the trial, thereby violating his right to confront the witnesses against him. Jones argues in his fifth assignment of error that his trial counsel was ineffective for possibly failing to object to the admission of the hearsay evidence.

{¶ 54}"It is well-established that the admission or exclusion of evidence rests within the sound discretion of the trial court." *State v. Gray*, 12th Dist. No. CA2011-09-176, 2012-Ohio-4769, ¶ 25, citing *In re Bays,* 12th Dist. No. CA2003-02-026, 2004-Ohio-915, ¶ 7. Absent an abuse of discretion, an appellate court will not disturb a trial court's ruling as to the admissibility of evidence. *State v. Issa,* 93 Ohio St.3d 49, 64 (2001).

{¶ 55}According to Evid.R. 801(C), hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Hearsay is not admissible unless it falls within one of the permissible hearsay exceptions. Evid.R. 802. Evid.R. 803(1)-(23) sets forth hearsay exceptions, some of which the trial court relied upon when admitting the evidence at trial.

{¶ 56}Jones argues that the trial court erred by permitting the jury to listen to recordings of Richard's calls to police on the day of the murder, as well as his own calls to police because those calls include statements from employees of the police department dispatch, all of which constituted hearsay. Jones' trial counsel raised pertinent objections to the admission of such evidence, so that Jones did not waive this issue on appeal. Accordingly, we will employ an abuse of discretion standard, and also overrule any argument that Jones' trial counsel was deficient for having failed to preserve for appeal the hearsay issue.

{¶ 57}As previously stated, the state played several phone calls from both Richard

and Jones discussing the threats that Jones made against his father. Specifically, the jury heard calls from Richard in which he relayed his fear that Jones was going to kill him based on Jones' threats throughout the day. In one call, recorded at 8:53 p.m., Richard told dispatch that Jones had threatened his life several times that day, and "I'm scared to go to sleep * * * I may not wake up." At several times, Richard asks police dispatch to hold while he takes a call from Jones on the other line. Richard would then relay to dispatch that Jones had just threatened to kill him again. For example, in one call recorded at 9:15 p.m., Richard told dispatch, "he just called me and said I'm a dead man * * * he said he's on his way over to kill me right now."

{¶ 58}The trial court found, and we agree, that these calls fall under multiple exceptions to the hearsay rule. Specifically, and according to Evid.R. 803,

> (1) Present sense impression. A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter unless circumstances indicate lack of trustworthiness.
>
> (2) Excited utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.
>
> (3) Then existing, mental, emotional, or physical condition. A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

{¶ 59}We find that the trial court properly admitted the phone calls as Richard's present sense impressions, since his statements were describing or explaining an event or condition made while Richard was either perceiving the event or condition, or immediately thereafter. Richard first described the fight between himself and Jones in the first phone call to police, including the fact that they had gone to Rally's for food and had argued over Jones'

alcohol consumption. The first phone call occurred within minutes of the argument, and there was no indication whatsoever that Richard's description and explanation lacked any trustworthiness. The first call describing the argument would also be admissible as Richard's then mental condition, as it described that Richard was fearful and feeling apprehension at the time he made the phone call. *See State v. Miller,* 96 Ohio St.3d 384, 2002-Ohio-4931 (permitting testimony that the victim was fearful and apprehensive where such testimony referred to the present rather than the past).

{¶ 60}The other phone calls regarding Richard's fear that Jones was going to kill him would also qualify as present sense impressions because he was describing to police the phone calls that occurred between himself and Jones. Richard and Jones would talk on the phone, Jones would threaten to kill Richard, and Richard would immediately call police to report the threat. In fact, some of Richard's statements were made to police with Jones on the phone's other line. Richard's statements would also qualify as his then mental condition, as the calls described his fear and apprehension that Jones was going to kill him.

{¶ 61}We would also qualify Richard's calls relating Jones' threats as excited utterances. Richard's calls to dispatch related to a startling event or condition, mainly the death threats, made while Richard was under the stress caused by the death threats. "To be admissible under Evid.R. 803(2) as an excited utterance, a statement must concern 'some occurrence startling enough to produce a nervous excitement in the declarant '* * * and must be made 'before there had been time for such nervous excitement to lose a domination over his reflective faculties.'" *State v. Huertas*, 51 Ohio St.3d 22, 31 (1990), quoting *Potter v. Baker*, 162 Ohio St. 488 (1955) paragraph two of the syllabus.

{¶ 62}As previously stated, Richard's phone calls occurred momentarily after, or even contemporaneous with, Jones' calls in which he threated to kill his father. This court has listened to the phone calls and finds that Richard was under the stress caused by the death

threats when he was speaking with dispatch. It is certainly reasonable that a 72-year-old man would have been placed in a state of nervous excitement after hearing multiple death threats from his son, especially given the fact that Richard believed the threats to be true as evidenced by his request that police drive by his house throughout the night.

{¶ 63}Jones also argues that the calls contained inadmissible evidence of alleged prior bad acts. Specifically, Richard makes reference to Jones hitting him with a telephone antenna days after he was released from the hospital, and refers to a time when Jones was arrested. However, the very brief mention by Richard of these events during the phone calls was not admitted by the state for the purpose of proving action in conformity therewith on a particular occasion, as is contemplated within Evid.R. 404. Moreover, any reference to Jones possibly hitting Richard, or having been arrested in the past, were harmless because evidence of the toxic relationship between father and son permeated the trial, and any reference to alleged prior bad acts did not lead to the jury's verdict where the evidence was overwhelming that Jones committed the murder with prior calculation and design. *State v. Rose*, 12th Dist. No. CA2011-11-214, 2012-Ohio-5607.

{¶ 64}Jones next argues that the trial court erred in admitting his calls to the police, during which he makes threats to Richard's life. During the phone calls, employees of police dispatch can be heard telling Jones not to call dispatch again and to "sober up." However, these statements by police dispatch employees are not hearsay because they were not being offered to prove the truth of the matter, i.e., whether Jones was intoxicated during the hours preceding Richard's death. Jones readily admitted to drinking alcohol that day, and the state was not trying to prove that he was intoxicated when he made the phone calls to dispatch. Therefore, the statements made by police dispatch employees were not hearsay within the meaning of Evid.R. 801(C).

{¶ 65}Jones also argues that his Sixth Amendment right to confront the witnesses

against him was violated because the trial court admitted the recordings without his being able to cross-examine Richard.  During trial, and over Jones' vigorous objections, the trial court admitted several of the phone calls, but also found a few tracks inadmissible based on their testimonial nature.  We find no abuse of discretion in the trial court's decision to admit the phone calls as it did.

{¶ 66}The Sixth Amendment to the United States Constitution preserves the right of a criminal defendant "to be confronted with the witnesses against him."  Therefore, the Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination."  *Crawford v. Washington*, 541 U.S. 36, 53-54, 124 S.Ct. 1354 (2004).  "The key issue is what constitutes a testimonial statement: 'It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause.'" *State v. Hood*, Slip Opinion No. 2012-Ohio-6208, ¶ 33, quoting *Davis v. Washington,* 547 U.S. 813, 821, 126 S.Ct. 2266 (2006).

{¶ 67}The United States Supreme Court has not defined what constitutes a "testimonial" statement, but it has given examples of "formulations" for testimonial statements such as:

> all ex parte in-court testimony or its functional equivalent; extrajudicial statements contained in formalized testimonial materials *(e.g.*, affidavits, depositions, prior testimony, confessions); and a class of statements that are made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

{¶ 68}*State v. Muttart,* 116 Ohio St.3d 5, 2007-Ohio-5267, ¶ 60, citing *Crawford* at 51-52.  In determining whether statements implicate Confrontation Clause analysis, courts are to view them objectively and should focus on the expectation of the declarant at the time of

making the statement. *State v. Stahl,* 111 Ohio St.3d 186, 2006-Ohio-5482, ¶ 22. "When a court must determine whether the Confrontation Clause bars the admission of a statement at trial, it should determine the 'primary purpose of the interrogation' by objectively evaluating the statements and actions of the parties to the encounter, in light of the circumstances in which the interrogation occurs." *Michigan v. Bryant*, __U.S. __, 131 S.Ct. 1143, 1162 (2011).

{¶ 69}After reviewing the record, we find that Richard's statements during his phone calls to police were not testimonial in nature. The statements were not made in the context of in-court testimony or its equivalent. There is no suggestion that they were elicited as part of a police investigation, offered in a sworn statement with intention of preserving the statement for trial, or they were a pretext or façade for state action as is discussed by the court in *Muttart*, 2007-Ohio-5267 at ¶ 61. Instead, Richard made the phone calls to elicit police assistance to meet an ongoing emergency.

{¶ 70}The United States Supreme Court has held that, "statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Davis v. Washington*, 547 U.S. 813, 822, 126 S. Ct. 2266 (2006). In so holding, the court reasoned that a call to police reporting an emergency situation "is ordinarily not designed primarily to 'establish or prove' some past fact, but to describe current circumstances requiring police assistance. * * * No 'witness' goes into court to proclaim an emergency and seek help." *Id.* at 827-828.

{¶ 71}The Court further explained this reasoning in *Michigan v. Bryant*, 131 S.Ct. at 1157:

> As our recent Confrontation Clause cases have explained, the existence of an "ongoing emergency" at the time of an encounter between an individual and the police is among the most important circumstances informing the "primary purpose" of an interrogation. The existence of an ongoing emergency is relevant

to determining the primary purpose of the interrogation because an emergency focuses the participants on something other than "prov[ing] past events potentially relevant to later criminal prosecution." Rather, it focuses them on "end[ing] a threatening situation." Implicit in *Davis* is the idea that because the prospect of fabrication in statements given for the primary purpose of resolving that emergency is presumably significantly diminished, the Confrontation Clause does not require such statements to be subject to the crucible of cross-examination.

This logic is not unlike that justifying the excited utterance exception in hearsay law. Statements "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition," are considered reliable because the declarant, in the excitement, presumably cannot form a falsehood. * * * An ongoing emergency has a similar effect of focusing an individual's attention on responding to the emergency.

(Internal citations and footnote omitted.)

{¶ 72}The record is clear that Richard made his phone calls in an effort to secure police assistance because of his bona fide belief that Jones was going to kill him. While Jones argues that the calls were not seeking emergency assistance because there was not an emergency in progress and there was no immediate threat, we disagree. Each time Richard called police, it was either immediately after or, sometimes during, the time that Jones was threatening his life.

{¶ 73}During the first call, Richard stated his desire to have police come to his house because of the argument that had occurred at Rally's, and because of his fear of Jones. Richard specifically asked that Jones not be arrested because he feared that Jones would come to his house during the middle of the night and vandalize his car. Richard also stated that Jones, "right now he's walking this way," and that "he's on his way walking toward my house." During the second call, Richard stated that he was calling again "because my son is threatening to kill me" and that "my son's been calling me up threatening me * * * what should I do about that?" The third call was deemed not admissible. The fourth call was made after

Jones called and threatened Richard's life again. Richard asked police to drive by his house during the night, and also stated that he was "scared to go to sleep" because of Jones statement that he "may not wake up," which Richard told police he believed was a threat on his life. Richard specifically stated that he called police because of his fear and that "I don't know what else to do." In the fifth call, Richard tells dispatch that Jones "just called" and told Richard that he was a "dead man." Richard then described Jones to dispatch and stated that Jones was "on foot" walking around, so that police could be looking for Jones and stop him before he harmed Richard. Richard also stated, "he's keeping me from going to sleep" because of the threats and his fear that he would not live through the night. In the sixth call, Richard told police dispatch that Jones had called again, and "I think I can tell you where he might be at," indicating where Jones was known to stay. The seventh, and final call, contained no words, only sounds of the scuffle.

{¶ 74} In each of the first six calls, Richard is asking the police for help and protection and providing them with information regarding Jones' threats so that police could respond accordingly. Richard was not trying to prove past events potentially relevant to a later criminal prosecution of Jones, but was focusing his statements on ending the threatening situation of Jones' death threats. In fact, Richard specifically asked police not to arrest Jones because he feared Jones' retribution. Therefore, it is abundantly clear that Richard was not anticipating that his statement would be used to support any future criminal prosecution of Jones, but rather was seeking police help to ensure his safety throughout the night.

{¶ 75} As previously mentioned, the trial court listened to the phone calls and determined that the admissible calls were non-testimonial in nature, whereas the portions of the calls that relayed details not necessary to help with the ongoing emergency were testimonial in nature and therefore inadmissible. The trial court's analysis was well-reasoned and comports with the precedent set forth by the United States and Ohio Supreme Courts

regarding proper Confrontation Clause jurisprudence.

{¶ 76}Having found that the trial court did not abuse its discretion in admitting the evidence, and that Jones did not receive ineffective assistance of counsel, Jones' fourth and fifth assignments of error are overruled.

{¶ 77}Judgment affirmed.

HENDRICKSON, P.J., and S. POWELL, J., concur.