[Cite as *State v. Henry*, 2014-Ohio-4624.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY


STATE OF OHIO,                                   :

        Plaintiff-Appellee,                      :

        - vs -                                          :

ANTHONY M. HENRY,                          :

        Defendant-Appellant.                   :

CASE NOS. CA2013-12-095
                    CA2013-12-097

O P I N I O N
10/20/2014


CRIMINAL APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
Case No. 13CR407, 13 CR 00538


D. Vincent Faris, Clermont County Prosecuting Attorney, Nicholas Horton, 76 South Riverside Drive, 2nd Floor, Batavia, Ohio 45103, for plaintiff-appellee

Michaela M. Stagnaro, 810 Sycamore Street, 6th Floor, Cincinnati, Ohio 45202, for defendant-appellant


**PIPER, J.**

{¶ 1}   Defendant-appellant, Anthony Henry, appeals his convictions and sentence in the Clermont County Court of Common Pleas for aggravated robbery with a gun specification, robbery, and felonious assault.[1]

---

1. Henry was charged by two indictments and the state proceeded against Henry through two different cases, one specific to the aggravated robbery charge and felonious assault, and another specific to the robbery charge. The two cases were consolidated so that one trial was had for both cases, and this appeal encompasses both cases as those cases were consolidated for trial.

{¶ 2} Raeshawn Wilson ran a major drug trafficking network in the Piccadilly Apartment Complex in Clermont County. Wilson and the mother of his child, Sarah Buckley, lived in an apartment in building 498 of the complex along with their child and a child Buckley had from a previous relationship with Larry Riley. The building in which Wilson lived was the center of the Piccadilly drug ring, and Wilson had keys to several apartments in that and surroundings buildings even though his name was not on any of the leases.

{¶ 3} Wilson sold narcotics, including heroin, crack cocaine, and marijuana, using several distributors who lived in or visited the Piccadilly complex. Other distributers or persons who participated in the drug ring included Carl Anderson, Deonta Williams, Jerrese Williams, and Justin Reynolds. Anthony Henry was also a known associate of Wilson and the rest of the Piccadilly drug ring, though he was not suspected by police as a participant in the actual selling and distribution of drugs.

{¶ 4} In June 2013, Deonta Williams realized that approximately 95 "bindles" of heroin were missing from the drug ring's supply. When Williams called Wilson to report that the heroin was missing, Henry answered Wilson's phone for him, and Williams reported his belief that Reynolds had stolen the drugs. Wilson and Williams decided to lure Reynolds to an apartment in the Piccadilly complex in order to reclaim their drugs or the money they believed Reynolds earned from selling the stolen drugs.

{¶ 5} Andre Smith and Christopher Early agreed to assist Wilson in luring Reynolds to the Piccadilly complex, and told Reynolds that they were picking him up and going to a rap recording. Instead, Smith and Early took Reynolds to the Piccadilly complex and accompanied him to an apartment there. Soon after his arrival, Reynolds saw Wilson, Henry, Jerrese Williams, and Deonta Williams approaching the apartment from downstairs.

{¶ 6} Immediately upon arriving in the apartment, the men accused Reynolds of stealing the missing heroin. When Reynolds denied stealing the drugs, Wilson pulled a gun

and put it to Reynolds' head. Jerrese Williams and Deonta Williams then went through Reynolds' pockets and took $800 cash from him while Henry blocked the stairwell so that Reynolds had no means of escape. The men then began beating Reynolds, and when Reynolds tried to escape, Henry forced him back toward the men who continued to beat him.

{¶ 7} Eventually, Reynolds made his way to the landing of the second floor, and Henry once again blocked his path. When Wilson asked one of the men to go to an apartment and retrieve a frying pan and a pair of gloves, Reynolds jumped out of the second story window and fell to the ground. Reynolds got up, and ran away from the apartment building. Henry and the other men began chasing Reynolds, and eventually found him passed out under a tree. Henry approached Reynolds, and began dragging Reynolds by the leg from underneath the tree. Henry then punched Reynolds in the ribs multiple times until someone yelled "cops." At that point, Henry ran away and left Reynolds lying on the ground, badly beaten.

{¶ 8} Once Henry ran, Reynolds got up and hid in the back patio space of one of the apartments, where he asked the resident for help. The resident called 911, and reported the incident to police. Before police arrived on the scene, Reynolds hid in the back patio portion of the apartment building, and saw that Henry was walking around the complex looking for him. When Henry eventually found Reynolds on the patio, he began to approach Reynolds until a police officer, Samantha Fedler, arrived on the scene and came to the back patio where Reynolds was hiding. When Henry saw Officer Fedler, he left the area.

{¶ 9} Officer Fedler, who saw Henry approaching the patio area, was familiar with Henry because of his known association with Wilson. Officer Fedler continued her approach, and Reynolds began yelling to her that Henry was trying to kill him and that the men were after him. Officer Fedler called for backup and medical attention, and Reynolds was eventually air lifted to the hospital for emergency care.

{¶ 10} Police continued their investigation and learned that Larry Riley, who fathered a child with the mother of Wilson's child, was friendly with the group of men who beat Reynolds. Agent Kenneth Mullis of the Clermont County Narcotics Unit, who had been investigating the Piccadilly drug ring for over a year, obtained a search warrant for Riley's property. While executing the search of Riley's property, officers found a Chevy Tahoe Wilson had abandoned there, as well as the gun used during the crimes against Reynolds. Riley admitted to Agent Mullis that he had disposed of the gun by throwing it into a pond on his property after Wilson gave it to him on the day Reynolds was beaten and robbed.

{¶ 11} All of the men involved in the drug ring that were involved in the robbery and assault of Reynolds were arrested at the Piccadilly complex on the day of the incident except for Henry. Two days after the incident, Henry learned that there was a warrant for his arrest and turned himself into authorities. Henry was subsequently indicted on single counts of aggravated robbery with a gun specification, robbery, and felonious assault. Henry pled not guilty to the charges, and the matter proceeded to a jury trial.

{¶ 12} Henry was found guilty by the jury on each count. The trial court merged the felonious assault and robbery convictions into the aggravated robbery conviction. The trial court sentenced Henry to five years on the aggravated robbery charge and three years on the gun specification for an aggregate sentence of eight years. Henry now appeals his convictions and sentence, raising the following assignments of error. For ease of discussion, we will address Henry's assignments of error out of order.

{¶ 13} Assignment of Error No. 6:

{¶ 14} THE EVIDENCE WAS INSUFFICIENT AS A MATTER OF LAW AND/OR AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE TO SUSTAIN APPELLANT'S CONVICTIONS.

{¶ 15} Henry argues in his sixth assignment of error that his convictions were against

- 4 -

the manifest weight of the evidence, and not supported by sufficient evidence.

{¶ 16} When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence in order to determine whether such evidence, if believed, would support a conviction. *State v. Wilson*, 12th Dist. Warren No. CA2006-01-007, 2007-Ohio-2298. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, superseded on other grounds.

{¶ 17} A manifest weight challenge examines the inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other. *Wilson*, 2007-Ohio-2298.

> In determining whether a conviction is against the manifest weight of the evidence, the court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Cummings*, 12th Dist. Butler No. CA2006-09-224, 2007-Ohio-4970, ¶ 12.

{¶ 18} While appellate review includes the responsibility to consider the credibility of witnesses and the weight given to the evidence, "these issues are primarily matters for the trier of fact to decide since the trier of fact is in the best position to judge the credibility of the witnesses and the weight to be given the evidence." *State v. Walker*, 12th Dist. Butler No. CA2006-04-085, 2007-Ohio-911, ¶ 26. Therefore, an appellate court will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances to correct a manifest miscarriage of justice, and only when the evidence presented at trial weighs heavily in favor of acquittal. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

{¶ 19} Henry was convicted of aggravated robbery in violation of R.C. 2911.01(A)(1),

which provides, "no person, in attempting or committing a theft offense * * *, shall do any of the following: have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it." Henry was also convicted of felonious assault in violation of R.C. 2903.11(A)(2), which provides, "no person shall knowingly do either of the following: cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance." Henry was also convicted of robbery in violation of R.C. 2911.02(A)(2), which provides, "no person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall do any of the following: inflict, attempt to inflict, or threaten to inflict physical harm on another."

{¶ 20} Henry was convicted under the theory that he was complicit with Wilson and the others in committing the crimes. According to R.C. 2923.03(A)(2), "no person, acting with the kind of culpability required for the commission of an offense, shall do any of the following: aid or abet another in committing the offense." In order to support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), "the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." *State v. Johnson*, 93 Ohio St.3d 240, 2001-Ohio-1336, syllabus. Such intent may be inferred from the circumstances surrounding the crime, including presence, companionship, and conduct before and after the offense is committed. *State v. Mota*, 12th Dist. Warren No. CA2007-06-082, 2008-Ohio-4163, ¶ 20. Moreover, evidence of aiding and abetting may be shown by either direct or circumstantial evidence. *State v. Salyer*, 12th Dist. Warren No. CA2006-03-039, 2007-Ohio-1659, ¶ 26.

{¶ 21} The culpability required for the "theft offense" element of aggravated robbery is "knowingly." *State v. Mays*, 12th Dist. Clermont No. CA2012-05-038, 2013-Ohio-1952, ¶ 24.

- 6 -

A person acts "knowingly" when he is "aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B).

{¶ 22} After reviewing the entire record, weighing inferences and examining the credibility of the witnesses, we find that Henry's convictions were supported by the manifest weight and sufficiency of the evidence. The state presented testimony and evidence from which the jury could have found the essential elements of aggravated robbery, robbery, and felonious assault proven beyond a reasonable doubt, and the jury did not clearly lose its way in determining that Henry was guilty based upon the evidence presented.

{¶ 23} The state presented the testimony of various witnesses, including some involved in the incident, as well as from the victim, Reynolds. Reynolds testified that on the day of the incident, he was picked up by Early and Smith, who told him that they were going to a rap music recording session. Reynolds testified that he is a music promoter and manager, and that he booked concerts involving a rap group of which Wilson and the others were a part. Reynolds testified that when the car proceeded toward the Piccadilly complex instead of the recording studio, he was not alarmed because he spent time with Wilson and the others on a daily basis.

{¶ 24} Reynolds testified that once he was in an apartment in the complex, he observed Wilson's car arrive in the parking lot from the apartment window, and that other men were with Wilson including Jerrese Williams, Deonta Williams, and Henry. Reynolds testified that the men began to ascend the stairs and that Deonta Williams and Henry stayed on the stair landing while Jerrese Williams and Wilson entered the apartment where Reynolds was waiting. Wilson immediately asked Reynolds where his drugs were, and then proceeded to demand that Reynolds turn over all of the money in his possession.

{¶ 25} Reynolds testified that he believed Wilson was joking until Wilson pulled out a

gun and put it to his neck and threatened to "ice" him. Jerrese Williams and Deonta Williams then approached Reynolds and patted down his clothing. Reynolds testified that the men took his keys, cell phone, and approximately $800 in cash. Reynolds also testified that the men began punching and kicking him, and that he was able to make his way to the staircase outside of the apartment but that he could not escape because Henry was blocking the stairs. Reynolds testified that Henry told him, "just tell [Wilson] the truth and none of this will happen."

{¶ 26} Reynolds testified that he was bleeding profusely, and that Wilson demanded that Reynolds clean up the blood from the stairwell, as well as stop the blood coming from his wounds. Reynolds removed his shirt and used it to soak up the blood from his head wounds, and tried to wipe the blood away from the stairs. Wilson then asked Reynolds what other items Reynolds had on his possession, and then proceeded to take another $250 Reynolds had in his back pocket. Wilson then asked one of the men on the staircase to go into an apartment and retrieve a frying pan and a pair of gloves. Reynolds testified that he believed that Wilson was going to kill him at that point.

{¶ 27} Reynolds testified that by the time Wilson asked for the gloves and frying pan, he and the men had made their way down onto the second flight of steps. Reynolds testified that Henry was still blocking his ability to escape, and that Henry told him that he should kill himself by jumping out the window. Reynolds also testified that while he was trapped on the stairs, Wilson threatened to kill Reynolds' mother and "box her up." At that point, Reynolds jumped out of the window and fell to the ground and then stood up to run, all while yelling for help. Reynolds testified that Jerrese Williams and Henry chased after him, and after hiding in a car momentarily, he tried hiding by a tree where he eventually fainted. Reynolds testified that as he regained consciousness, Henry pulled him from beneath the tree and punched him in the ribs until someone in the complex yelled "cops." Both Jerrese Williams and Henry ran

upon hearing that police were coming, while Reynolds tried to catch his breath.

{¶ 28} After approximately a minute or two, Henry got up and looked for a place to hide. Reynolds testified that he made his way to the back patio area of one apartment building, and that he saw a woman in her apartment. Reynolds asked the woman for help, and she called 911 while Reynolds hid behind railroad ties stacked on the woman's patio. Reynolds testified that he could see Henry looking for him, and that Henry spotted him once he walked closer to the patio. Reynolds testified that Henry began approaching him but stopped and ran into the woods when an officer arrived on the scene and yelled "stop." Officers then assisted Reynolds, and he was later air lifted to the hospital where he received treatment for his injuries.

{¶ 29} The state called the 911 caller, who testified that she called 911 after Reynolds hid on her back patio and asked her to call for help. The caller testified that Reynolds told her that he had just been "jumped" and that the men who were trying to kill him had a gun. The 911 caller testified that she called 911 and reported the incident as Reynolds asked her to do, and informed the 911 dispatcher that the men used a gun during the crimes.

{¶ 30} The state called Officer Samantha Fedler of the Union Township Police Department. Officer Fedler testified that she was on duty on the day of the incident, and that she responded to a dispatch directing her to the Piccadilly apartments regarding an armed robbery. Officer Fedler testified that when she parked her cruiser near the apartment building, she noticed Henry walking around the complex. Officer Fedler testified that she is familiar with Henry because she regularly patrols the Piccadilly complex area, and regularly saw Henry there spending time with the other men who were involved in the incident. Officer Fedler testified that she had previously observed Henry at the Piccadilly complex with Wilson, Deonta Williams, and Jerrese Williams, and that the men would congregate in front of the apartment buildings.

{¶ 31} Officer Fedler testified that after she arrived at the complex on the day of the incident, she began looking for the victim. Officer Fedler was advised that Reynolds was located on the patio area of the 911 caller's apartment, and she ran toward that area. When she approached Reynolds, Reynolds was injured and frightened, and told her that "they're going to kill me." When Officer Fedler asked who "they" were that were going to kill him, Reynolds responded "Jerrese Williams, Deonta Williams,[Wilson] and Anthony Henry." Officer Fedler also testified that Reynolds told her that the men had robbed him, held a gun to his head, and beat him. Officer Fedler testified that Reynolds told her that Henry followed him around the building, and that Reynolds gave her a description of what Henry was wearing, which was the same black shirt and black hat that Officer Fedler saw Henry wearing when she first arrived at the complex.

{¶ 32} The state then called Officer Dave Perkins of the Union Township Police Department. Officer Perkins testified that he also responded to the dispatch directing him to the Piccadilly complex in response to a report of robbery and assault. Officer Perkins testified that he heard the information shared by Officer Fedler upon her arrival, and that based on the information, he began looking for Wilson. Officer Perkins testified that he located Wilson in a car driven by Sarah Buckley, the mother of Wilson's child. Officer Perkins took Wilson into custody, and then looked for other suspects. During his search, Buckley gave Officer Perkins the iPhone and keychain taken from Reynolds during the robbery and assault.

{¶ 33} Officer Perkins learned that the other men may have been located in an apartment at the Piccadilly complex, and went to the apartment to investigate. Inside the apartment, Officer Perkins located Jerrese Williams and Deonta Williams. Officer Perkins testified that he is familiar with Henry because of Henry's known association with Wilson and the other men, but that Henry was not in the apartment when he found Jerrese Williams and

Deonta Williams there.

{¶ 34} The state then called Deonta Williams to testify. Williams testified that he lived in the Piccadilly complex, and that he is Wilson's cousin. Williams testified that he participated in Wilson's drug ring that was run out of the Piccadilly complex. In regard to Henry, Williams testified that whatever Wilson told Henry to do, Henry would do it. Williams testified that he discovered that drugs were missing, and that he called Wilson to report the theft. Williams testified that Henry picked up Wilson's phone, and that he told Henry that Reynolds was suspected of stealing the drugs. Williams testified that Henry expressed his belief that Reynolds was a thief, and that Henry stated his plans to "fuck [Reynolds] up."

{¶ 35} Williams then testified to the events whereby Reynolds was lured to the apartment building and joined there by Wilson, Jerrese Williams, and Henry. Williams testified that when Wilson accused Reynolds of stealing the drugs, Wilson held the gun to Reynolds' head and threaten to "ice" him. Williams also testified that Wilson told Henry that he "better not let [Reynolds] escape," and that Henry pushed Reynolds back up the stairs to continue being beaten by the men. Williams testified that as soon as Reynolds jumped out of the window, Wilson told Henry to catch Reynolds, and that Henry began chasing after Reynolds.

{¶ 36} Williams testified that he went back to his apartment after Reynolds ran, and that he was joined there later by Jerrese Williams and Henry. Williams testified that Henry told him that he "fucked [Reynolds] up" and then asked for marijuana. After obtaining the marijuana, Henry left Williams' apartment.

{¶ 37} The state also called Larry Riley, who testified that he has a child by Sarah Buckley, and that he is familiar with all of the men involved in the incident. Riley testified that he spends time at the Piccadilly complex every weekend to see his child, and that he was aware that Wilson and others sold drugs from that location.

{¶ 38} Riley testified that on the day of the incident, he was at the Piccadilly complex in an apartment getting his hair cut. Riley testified that he heard the scuffle outside when Reynolds was being beat, and that Reynolds tried to seek protection in the apartment in which Riley was located. Riley testified that during the time that Reynolds was being confronted by the men, Wilson had a gun in his possession and that Wilson later gave him the gun he had pointed at Reynolds' head. Riley left the apartment complex long enough to hide the gun under a mattress that was near a creek in the back of the Piccadilly complex. Riley testified that when he returned from hiding the gun, he saw Henry cornering Reynolds on the staircase and not letting him pass. Riley returned to his hair cut, and then heard the commotion when Reynolds jumped out of the window. Riley testified that he looked out of the apartment window and saw Henry running in search of Reynolds.

{¶ 39} Riley also testified that later in the evening, Henry came into the apartment building and told him that he had beat Reynolds and that Henry thought he had broken Reynolds' rib because he beat Reynolds "pretty good." Riley testified that Sarah Buckley came to the apartment as well, and told the two men that Wilson had been arrested. Henry then left the apartment complex.

{¶ 40} Riley testified that the day after the incident occurred, he returned to the Piccadilly complex and retrieved the gun, took it to his property, and threw it into the pond. Riley testified that Agent Mullis later came to his property to execute the search warrant, and that Riley directed the police to the pond where he had thrown the gun. Divers located the gun used against Reynolds on the day of the incident at the bottom of the pond near Riley's property.

{¶ 41} The state then called Agent Kenneth Mullis of the Union Township Police Department, Clermont County Narcotics Unit. Agent Mullis testified that he had been investigating the drug ring centered in the Piccadilly apartment complex for approximately 17

months.  Agent Mullis testified that Wilson, Jerrese Williams, Deonta Williams, and Reynolds were involved in the drug ring, and that they dealt heroin, cocaine, and marijuana.  Agent Mullis testified that based on his surveillance and investigation, he determined that Wilson was the leader of the ring and controlled the drug distribution.  Agent Mullis testified that Henry was also associated with the men who comprised the drug ring, and that he was familiar with Henry through his surveillance.

{¶ 42} Agent Mullis testified that he was informed that Reynolds had been robbed and beaten at the Piccadilly complex by Wilson and the other men.  Agent Mullis went to the hospital and briefly interviewed Reynolds, then went back to Piccadilly to continue the investigation.  Three days after the incident occurred, Agent Mullis and supporting officers executed search warrants on various apartments and locations within the Piccadilly complex.  Police seized syringes, scales, and heroin as a result of executing the search warrants.

{¶ 43} Agent Mullis also learned that Larry Riley was associated with the men who comprised the drug ring, and that Riley had property away from the Piccadilly complex.  Agent Mullis testified that he obtained a search warrant for Riley's property, and that as a result of that search, police seized the gun used against Reynolds.

{¶ 44} After the state rested its case, Henry testified in his own defense.  He stated that his involvement in the incident was different than what the state asserted during its case-in-chief.  Henry testified that he did not go over to the Piccadilly complex to harm Reynolds, but rather was with Wilson that day because they were going to Kings Island.  Henry testified that Wilson went to the Piccadilly complex once he received news that Reynolds had stolen drugs from the drug ring, but that he did not go into the apartment building at first to confront Reynolds.  Henry testified that he only later came into the stair well to try to calm the situation.  However, in explaining the events as they occurred on the day of the incident, Henry admitted that he stopped Reynolds from leaving the apartment building.

**{¶ 45}** During his testimony, Henry stated that Reynolds "was looking at me like he wanted me to let him pass, but I just – I was refusing.  * * * I don't let him past me.  * * * I just stood there with my hands up, like if you try to get past me I'm not letting you past me at this point in time."  Henry also testified that he followed Reynolds once Reynolds jumped out of the window, and admitted that he punched Reynolds several times, though he claimed the punches were in self-defense.  Henry also explained that after he punched Reynolds he left, but then went around the complex looking for Reynolds to check on his condition.  Henry testified that when he saw the police cruiser arrive on the scene while he was looking for Reynolds, he "took off" and "left" because he was "not about to deal with this shit."  Henry also testified he left the Piccadilly complex later that night and went to his sister's home, then turned himself in once he learned there was a warrant for his arrest.

**{¶ 46}** The jury heard testimony from the state's witnesses, as well as from Henry in his own defense.  "Upon acknowledging that such extensive testimony will inevitably produce some inconsistent or conflicting assertions, we recognize the sound principal that the trier of fact is best positioned to weigh the credibility of the individual witness and reach a conclusion based on the totality of the evidence."  *State v. Hernandez*, 12th Dist. Warren No. CA2010-10-098, 2011-Ohio-3765, ¶ 41, quoting *State v. Dunn*, 9th Dist. Lorain No. 04CA008549, 2005-Ohio-1270, ¶ 10.

**{¶ 47}** Despite Henry's testimony that he was not complicit in the robbery and assault of Reynolds, the jury chose to believe the state's witnesses and found the state's theory of the case more probable than Henry's version of what occurred that day.  From the state's evidence, the jury was able to determine that Henry supported, assisted, encouraged, and cooperated with Wilson and the others in the commission of the crimes against Reynolds, and that Henry shared the criminal intent of the men who assaulted and robbed Reynolds.  Specifically, Henry admitted that he did not permit Reynolds to leave the staircase in order to

escape the assault and robbery, and he later admitted to going after Reynolds after he jumped from the window and punching him multiple times in the ribs.

{¶ 48} Based on the evidence presented at trial, we find that the jury could have found the essential elements of the crimes proven beyond a reasonable doubt. We further find that the jury did not clearly lose its way or create such a manifest miscarriage of justice that Henry's convictions must be reversed and a new trial ordered. As such, Henry's sixth assignment of error is overruled.

{¶ 49} Assignment of Error No. 1:

{¶ 50} THE TRIAL COURT ERRED AS A MATTER OF LAW BY ALLOWING THE STATE TO INTRODUCE HEARSAY STATEMENTS WHICH VIOLATED APPELLANT'S RIGHT TO A FAIR TRIAL.

{¶ 51} Henry argues in his first assignment of error that the trial court erred by permitting the state to introduce hearsay statements, thereby violating his right to a fair trial.

{¶ 52} "It is well-established that the admission or exclusion of evidence rests within the sound discretion of the trial court." *State v. Gray*, 12th Dist. Butler No. CA2011-09-176, 2012-Ohio-4769, ¶ 25. Absent an abuse of discretion, an appellate court will not disturb a trial court's ruling as to the admissibility of evidence. *State v. Issa*, 93 Ohio St.3d 49, 64 (2001). An abuse of discretion connotes more than an error in law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *State v. Barnes*, 94 Ohio St.3d 21, 23 (2002).

{¶ 53} According to Evid.R. 801(C), hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Hearsay is not admissible unless it falls within one of the permissible hearsay exceptions. Evid.R. 802. Evid.R. 803(1)-(23) sets forth hearsay exceptions, some of which were applicable at trial, including excited utterance and present state of mind.

{¶ 54} Henry's counsel objected to some of the hearsay testimony, but not all. When no objection is raised to a hearsay statement, this court will review the issue using a plain error analysis. Pursuant to Crim.R. 52(B), "plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Plain error exists where there is an obvious deviation from a legal rule that affected the defendant's substantial rights by influencing the outcome of the proceedings. *Barnes*, 94 Ohio St.3d at 27. "Plain error does not exist unless it can be said that but for the error, the outcome of the trial would clearly have been otherwise." *State v. Biros*, 78 Ohio St.3d 426, 436 (1997). Courts should notice plain error "with the utmost caution, under exceptional circumstances and only to prevent a miscarriage of justice." *State v. Lynn*, 129 Ohio St.3d 146, 2011-Ohio-2722, ¶ 14.

{¶ 55} Henry specifically challenges the testimony of Officer Fedler regarding statements made by Reynolds. Henry objected to Officer Fedler's testimony at trial, so we will employ an abuse of discretion standard when determining if the trial court properly admitted the testimony. We find no abuse of discretion in admitting the testimony, as the testimony falls within the excited utterance exception.

{¶ 56} Officer Fedler testified that when she found Reynolds hiding on the patio, he told her that Henry and the other men were trying to kill him. While the statements made by Officer Fedler about what Reynolds told her were hearsay, such testimony falls squarely within the excited utterance exception to the hearsay rule.

{¶ 57} According to Evid.R. 803(2), an excited utterance is "a statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." "To be admissible under Evid.R. 803(2) as an excited utterance, a statement must concern 'some occurrence startling enough to produce a nervous excitement in the declarant' * * * and must be made 'before there had been time for

such nervous excitement to lose a domination over his reflective faculties.'" *State v. Jones*, 12th Dist. Butler No. CA2012-04-077, 2013-Ohio-654, ¶ 61, quoting *State v. Huertas*, 51 Ohio St.3d 22, 31 (1990).

**{¶ 58}** Officer Fedler testified that when she came upon Reynolds, he told her that the men were going to kill him. The state asked Officer Fedler to describe Reynolds' demeanor when he made his statements, and she stated that "his voice was shaky. He was almost quivering when he told me that." Officer Fedler's testimony and description of Reynolds demonstrates that Reynolds' statements to her were excited utterances. Reynolds made his statement under the stress of a startling event when he told Officer Fedler who was trying to kill him, and indicated who had just robbed him and beaten him. The fact that his voice was shaking and that he was almost quivering demonstrates that Reynolds made his statements while he was under the stress of excitement caused by the event, especially since Reynolds' life had just been threatened, Reynolds was badly beaten by the men, and he had just been robbed of his possessions. Moreover, and in order to save his life, Reynolds had just jumped from a second-story window, run for his life, had passed out, regained consciousness, only to be beaten more, and then ran and hid on the patio.

**{¶ 59}** Even when hiding, Reynolds was aware that Henry was looking for him, and had found his hiding place. Only seconds passed between Henry walking toward Reynolds and Officer Fedler coming upon the scene, and it is obvious from the record that Reynolds was still under the stress and excitement of the event when he told Officer Fedler that the men were trying to kill him, when he identified who was involved in the incident, and exactly what they had done. As such, the trial court did not abuse its discretion in admitting Officer Fedler's testimony under a hearsay exception.

**{¶ 60}** Henry also argues that the state introduced hearsay statements during the testimony of the 911 caller regarding Reynolds' statements to her. Henry did not object to

the testimony as hearsay, so this court will employ a plain error standard of review. Regardless of whether the plain error or abuse of discretion standard controls, the statements Reynolds made to the 911 caller were also excited utterances and were admissible as a hearsay exception.

{¶ 61} The 911 caller testified that Reynolds approached the back of her apartment and said "could you please call the police, because I've been jumped," and also that he said "please. Please, call the police." The 911 caller also testified that Reynolds told her to tell the 911 dispatcher that the men had a gun. These statements were made while Reynolds was under the stress of being chased by Henry and trying to seek help from police in order to save his life. Reynolds was still in the process of escaping, had just been beaten by Henry and dragged from beneath a tree, and was imploring the 911 caller to call for help. The statements were properly admitted as excited utterances, and no plain error occurred.

{¶ 62} Henry also challenges testimony from Reynolds regarding statements Wilson made to him. Henry did not object to the hearsay testimony in this instance so we will again employ a plain error standard. Regardless of the standard, we find no error in the admission of the statements. Reynolds testified to several statements Wilson made when Wilson first confronted Reynolds about stealing the heroin and throughout the time that Reynolds was being assaulted.[2] Reynolds testified that Wilson told him to "give it up," and that Wilson stated, "I'm not playing. I'm going to ice your ass." These statements, while

---

2. Henry does not list within his appellate brief which specific statements he is challenging as hearsay, or even point to any specific reference in the trial transcript where the trial court erred in admitting testimony. Instead, Henry merely argues in his brief that, "the State also introduced hearsay statements * * * made by [Wilson] during Mr. Reynolds' testimony, about what happened that day." While this court will address some specific testimony regarding the statements Wilson made to Reynolds, Henry has failed to direct this court's attention to the specific testimony he is challenging. "An appellant's brief must precisely set forth the specific assignments of error for appellate review, including any specific issues for review that relate to each assignment of error." *State v. Eberle*, 12th Dist. Butler No. CA99-12-210, 2001 WL 88201, *1 (Jan. 29, 2001). While it is not this court's duty to craft Henry's arguments for him, we have nonetheless reviewed the entire trial transcript and find that no plain error occurred regarding hearsay statements admitted into evidence at any point during Reynolds' testimony about what Wilson said to him.

hearsay, were admissible in order to demonstrate Wilson's intent that day.

{¶ 63} According to 803(3), there is a hearsay exception for "then existing, mental, emotional, or physical condition." The rule defines the exception as a

> statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

{¶ 64} Reynolds' testimony about Wilson's statements fall within the purview of this hearsay exception. Reynolds' testimony regarding Wilson's statements demonstrate Wilson's intent, plan, or motive in that Wilson expressed his intent to "ice" Reynolds, as well as his intent to make Reynolds admit to stealing the heroin or punishing Reynolds for his alleged theft by continuing to beat him.

{¶ 65} Having found that the trial court did not err in admitting the hearsay testimony, Henry's first assignment of error is overruled.

{¶ 66} Assignment of Error No. 2:

{¶ 67} THE TRIAL COURT ERRED AS A MATTER OF LAW BY ADMITTING IRRELEVANT AND PREJUDICIAL EVIDENCE TO BE HEARD BY THE TRIAL COURT DURING THE COURSE OF THE TRIAL.

{¶ 68} Henry argues in his second assignment of error that the trial court improperly admitted irrelevant and prejudicial evidence regarding Agent Mullis' investigation into the drug activity at the Piccadilly complex.

{¶ 69} Stated again, the admission of evidence is within the trial court's discretion so that we will not reverse the trial court's decision absent an abuse of discretion. *State v. Gray*, 12th Dist. Butler No. CA2011-09-176, 2012-Ohio-4769, ¶ 25. Evid.R. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of

consequence to the determination of the action more probable or less probable than it would be without the evidence." According to Evid.R. 403(A), relevant evidence is not admissible "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."

{¶ 70} Henry argues that the testimony from Agent Mullis regarding his surveillance of the apartment complex for drug-related activity was irrelevant and should have been inadmissible. Henry did not object to Agent Mullis' testimony regarding the surveillance, though he did object to the admission of exhibits connected to Agent Mullis' testimony. Regardless of the standard of review, whether it be plain error or abuse of discretion, the trial court did not err in admitting the evidence, as Agent Mullis' testimony was relevant and the danger of prejudice was far outweighed by its probative value.

{¶ 71} During Agent Mullis' testimony, he indicated that he had investigated the Piccadilly drug ring for approximately 17 months, and was familiar with each of the men involved in robbing and assaulting Reynolds. Although Henry argues that Agent Mullis' testimony was irrelevant, we disagree.

{¶ 72} Agent Mullis' testimony was relevant because it had a tendency to demonstrate that Henry was associated with Wilson and the other men involved in the crimes against Reynolds. Police surveillance of the Piccadilly complex showed that Henry was seen at the complex with Wilson and the others, and that Henry was known to do whatever Wilson told him to do. The fact that Wilson ran the drug ring at the Piccadilly complex demonstrates that the men had a motive on the day they robbed and assaulted Reynolds, and that such motive was to recoup their money or drugs and to punish Reynolds for his alleged theft of the ring's heroin.

{¶ 73} Moreover, any prejudice that may have been caused by the testimony was substantially outweighed by its probative value. Agent Mullis' testimony permitted the jury to

learn about the drug ring, and what role each man played in the ring. The jury heard that Henry was not involved in the sales or distribution aspect of the ring, but that he associated with Wilson and the men in other ways, such as spending time with them at the Piccadilly complex, answering Wilson's phone when Williams called to report the theft, and willingly participating in the crimes against Reynolds by preventing his escape and beating him.

{¶ 74} Despite Henry's argument, he was not found guilty by association with the drug ring, he was found guilty because he was complicit in the crimes against Reynolds. Agent Mullis' testimony was relevant in that such testimony allowed the jury to understand the motive and intent of the men involved in the crimes, and why Henry participated in the crimes. As such, the testimony was admissible at trial, and no error occurred, plain or otherwise, in its admission. Therefore, Henry's second assignment of error is overruled.

{¶ 75} Assignment of Error No. 3:

{¶ 76} THE TRIAL COURT ERRED AS A MATTER OF LAW BY PERMITTING THE PROSECUTOR TO MAKE IMPROPER REMARKS TO THE JURY THUS PREJUDICING APPELLANT'S RIGHT TO A FAIR TRIAL.

{¶ 77} Henry argues in his third assignment of error that the trial court erred by permitting the prosecutor to make improper statements during closing arguments by suggesting that Henry lied to police and did not offer at trial any evidence to support contentions made during the defense.

{¶ 78} Since Henry did not object to the prosecutor's statements, we will review the admissibility of the statements using a plain error standard of review. "Prosecutorial misconduct rises to the level of plain error if it is clear the defendant would not have been convicted in the absence of the improper comments." *State v. Setty*, 12th Dist. Clermont Nos. CA2013-06-049, CA2013-06-050, 2014-Ohio-2340, ¶ 51, citing *State v. Olvera-Guillen*, 12th Dist. Butler No. CA2007-05-118, 2008-Ohio-5416, ¶ 27.

**{¶ 79}** The state is entitled to a certain degree of latitude in making its concluding remarks. *State v. Layne*, 12th Dist. Clermont No. CA2009-07-043, 2010-Ohio-2308, ¶ 58. A court will find prosecutorial misconduct only when the remarks made during closing were improper and those improper remarks prejudicially affected substantial rights of the defendant. *State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, ¶ 62. "The focus of an inquiry into allegations of prosecutorial misconduct is upon the fairness of the trial, not upon the culpability of the prosecutor." *State v. Gray*, 12th Dist. Butler No. CA2011-09-176, 2012-Ohio-4769, ¶ 57.

**{¶ 80}** Having reviewed the prosecutor's closing argument, we find the prosecutor's statements to be proper. The remarks complained of by Henry include the prosecutor's statement that Henry lied to police and fled the scene of the crime, as well as that Henry did not have evidence to support claims he made during his defense.

**{¶ 81}** Regarding the prosecutor's statements that Henry lied to police and fled the scene, the evidence at trial demonstrated that Henry did both. On cross-examination, Henry was impeached about the lies he told during the interview he had with police on the day he turned himself in. The state played a tape recording of the interview, and asked Henry why he chose to either leave out details, or not tell the whole truth when asked questions about his involvement in the crimes. Henry admitted that he did not tell the entire truth during certain points of the interview, and further admitted that he was defensive when asked certain questions. The prosecutor did not call Henry a liar in general, the prosecutor merely reiterated that the evidence demonstrated that Henry lied to police during the interview. Therefore, the prosecutor's statement that Henry lied to police was an accurate assessment of the evidence produced during trial.

**{¶ 82}** Similarly, and as will be discussed in more detail within Henry's next assignment of error, the jury heard ample evidence that Henry fled the scene upon both the

pronouncement by someone in the complex that "cops" were coming, and upon seeing Officer Fedler arrive on the scene. The prosecutor's statements regarding Henry's decision to leave the scene were based upon the testimony elicited at trial, including Henry's own admissions, and did not form the basis of any improper remarks.

{¶ 83} Henry also challenges the prosecutor's statement that Henry failed to offer any evidence that the events unfolded the way he claimed they did. Henry testified in his own defense and asserted that he was not at the Piccadilly complex on the day of the incident to assist Wilson in confronting or punishing Reynolds for stealing the drug ring's heroin. Henry testified that he did nothing to assist Wilson, and generally asserted that he was not complicit in the crimes because he was actually trying to help Reynolds after he jumped out the window. Henry also asserted that he only punched Reynolds in the ribs multiple times because he was acting in self-defense. However, Henry's assertions were not supported by any other evidence, and the only evidence offered in support of Henry's defense was his own testimony.

{¶ 84} As stated by the Ohio Supreme Court, "it is long-standing precedent that the state may comment upon a defendant's failure to offer evidence in support of its case." *State v. Collins*, 89 Ohio St.3d 524, 527-28 (2000). A prosecutor's statements regarding a defendant's failure to support his defense does not shift the burden of proof to the defense. *Id*. As such, "the prosecutor is not precluded from challenging the weight of the evidence offered in support of an exculpatory theory presented by the defense." *Id*. *See also State v. Myers*, 12th Dist. Fayette No. CA2005-12-035, 2007-Ohio-915, ¶ 26 (finding no error in prosecutor's statement that the defense failed to present any evidence to support appellant's claim that he did not have a gun where the prosecutor's statement "was merely a comment on the defense's failure to present or extract evidence in support of that argument").

{¶ 85} The prosecutor stated that there was no physical evidence to support Henry's

assertion that he was helping Reynolds on the day of the incident, or that he was acting in self-defense when he punched Reynolds. The prosecutor's statement was accurate and a permissible comment on Henry's failure to offer evidence in support of his claims.

{¶ 86} Moreover, and even if we assumed arguendo that the prosecutor's statements were improper, we find that the outcome of the proceeding would not have been different absent such statements. In light of the evidence presented at trial, including the testimony of the state's witnesses and Henry's testimony, Henry would have been convicted in the absence of the prosecutor's remarks.

{¶ 87} Having found that the prosecutor did not make any improper remarks, and that the trial court did not err in permitting the closing argument to proceed, Henry's third assignment of error is overruled.

{¶ 88} Assignment of Error No. 5:

{¶ 89} THE TRIAL COURT ERRED BY INSTRUCTING THE JURY ON FLIGHT WHEN THE EVIDENCE DID NOT WARRANT IT.

{¶ 90} Henry argues in his fifth assignment of error that the trial court erred in including a jury instruction on flight because the evidence presented at trial did not warrant such an instruction.

{¶ 91} Jury instructions must contain "all matters of law necessary for the information of the jury in giving its verdict." R.C. 2945.11. "The trial court should instruct the jury if the proposed instruction is a correct statement of law, applicable to the facts in the case, and reasonable minds could reach the conclusion sought by the specific instruction." *State v. Pringle*, 12th Dist. Butler Nos. CA2007-08-193 and CA2007-09-238, 2008-Ohio-5421, ¶ 51.

{¶ 92} The decision whether to issue a flight instruction rests within the trial court's discretion and will not be reversed on appeal absent an abuse of discretion. *State v. Campbell*, Butler App. No. CA2009-01-002, 2009-Ohio-6044. However, we need not analyze

whether the trial court abused its discretion because Henry failed to object at the time the trial court gave the jury its instructions, and has therefore waived that argument except for plain error. As such, we will consider whether the instruction amounted to plain error.

**{¶ 93}** "Flight from justice means some escape or affirmative attempt to avoid apprehension." *State v. McClurkin*, 12th Dist. Butler No. CA2007-03-071, 2010-Ohio-1938, ¶ 37, quoting *State v. White*, 6th Dist. Lucas No. L-06-1363, 2008-Ohio-2990, ¶ 68. However, "a mere departure from the scene of the crime is not to be confused with a deliberate flight from the area in which the suspect is normally to be found." *McClurkin* at ¶ 37. A jury instruction on consciousness of guilt based upon the flight of the accused is appropriate when supported by sufficient evidence in the record. *State v. Grindstaff*, 12th Dist. Clermont No. CA2013-09-074, 2014-Ohio-2581.

**{¶ 94}** The trial court gave the jury the following instruction regarding flight.

> Testimony has been admitted indicating that the Defendant fled the scene of the crime.
>
> You are instructed that the Defendant leaving the scene of the crime alone does not raise a presumption of guilt, but it may tend to indicate the Defendant's consciousness of guilt. If you find that the facts do not support that the Defendant fled the scene of the crime, or if you find that some other motive prompted the Defendant's conduct, or if you are unable to decide what the Defendant's motivation was, then you should not consider this evidence for any purpose.
>
> However, if you find that the facts support that the Defendant engaged in such conduct, and if you decide that the Defendant was motivated by a consciousness of guilty [sic] you may but are not required to consider that evidence in deciding whether the Defendant is guilty of the crimes charged. You alone will determine what weight if any is to be given to this evidence.

**{¶ 95}** This jury instruction was proper because there was evidence presented at trial that Henry fled the scene on two separate occasions when he knew that police were coming to the complex or had arrived. Reynolds testified that Henry only stopped beating him when

someone at the complex yelled "cops," and that Henry ran away when he heard that police were arriving at the complex.

{¶ 96} The other evidence admitted during trial demonstrated that Henry also left the scene when he saw that Officer Fedler had arrived at the complex, even after she yelled "stop." Henry admitted during his testimony that "I look over, I see a cruiser. I'm like, man, I'm not about to deal with this shit. If [Reynolds] is not here, I'm not gonna be here. I took off. I left." Similarly, when Henry learned that Wilson had been arrested, he left the apartment complex and went to his sister's house, and no evidence was offered that Henry stayed at the complex at any time to cooperate in the investigation. Given this evidence, a consciousness of guilt jury instruction was appropriate.

{¶ 97} Further, the language utilized by the trial court in giving the consciousness of guilt instruction was clearly neutral in its effect, and only permitted, not required, the jury to draw the conclusion that Henry displayed a consciousness of guilt by leaving when warned that the police were coming, leaving even when Officer Fedler had told him to stop, and leaving after he learned that Wilson had been arrested. The instruction specifically provided that it was up to the jury to determine whether Henry actually fled and, if so, whether the flight was motivated by guilt or some other innocent reason. Given the facts of this case and the evidence presented at trial, we find that the trial court's consciousness of guilt jury instruction was proper under either a plain error or abuse of discretion standard of review. Having found that the trial court properly instructed the jury on flight, Henry's fifth assignment of error is overruled.

{¶ 98} Assignment of Error No. 4:

{¶ 99} APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF HIS CONSTITUTIONAL RIGHTS THUS PREJUDICING HIS RIGHT TO A FAIR TRIAL.

{¶ 100} Henry argues in his fourth assignment of error that he received ineffective assistance of counsel.

{¶ 101} To prove ineffective assistance of counsel, an appellant must establish that first, "his trial counsel's performance was deficient; and second, that the deficient performance prejudiced the defense to the point of depriving the appellant of a fair trial." *State v. Myers,* 12th Dist. Fayette No. CA2005-12-035, 2007-Ohio-915, ¶ 33, citing *Strickland v. Washington,* 466 U.S. 668, 689, 104 S.Ct. 2052 (1984). Regarding the first prong, an appellant must show that his counsel's representation "fell below an objective standard of reasonableness." *Strickland,* 466 U.S at 688. The second prong requires the appellant to show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

{¶ 102} Henry cites to several occurrences at trial to demonstrate that his counsel's performance was deficient and that such deficiency was prejudicial. Several of Henry's challenges have already been addressed in his previous assignments of error. For example, Henry asserts that his counsel was ineffective for failing to object to hearsay statements during the 911 caller's testimony regarding what Reynolds told her, as well as Reynolds' testimony about statements Wilson made to Reynolds. However, as we discussed within Henry's first assignment of error, these statements were properly admitted as hearsay exceptions so that there was no deficiency in counsel's performance, and no prejudice.

{¶ 103} Henry also asserts that his trial counsel was ineffective for failing to object to the flight instruction. However, as we discussed within Henry's fifth assignment of error, the flight instruction was properly given by the trial court so that any objection made by Henry's trial counsel would have been meritless. Similarly, Henry asserts that his trial counsel was ineffective for failing to object to the prosecutor's statements made during closing. However, and as we discussed within Henry's third assignment of error, the prosecutor's statements did

- 27 -

not constitute misconduct, and objections to such statements would not have been sustained.

{¶ 104} Other than the claimed deficiencies that were previously addressed in Henry's other assignments of error, Henry also alleges that his counsel was ineffective for failing to impeach Reynolds about contradictory statements, and for asking damaging questions to witnesses.

{¶ 105} Henry argues that his counsel was deficient for failing to impeach Reynolds' testimony regarding contradictory statements Reynolds made to police. Henry asserts that had his counsel impeached Reynolds' credibility, the jury would have been made aware that Reynolds was not credible. However, there is no indication that the results of the trial would have been any different had Henry's trial counsel asked questions about statements Reynolds made to police.

{¶ 106} The jury was well aware that Reynolds was an active member of the Piccadilly drug ring, and that he was often accused of theft and nefarious dealings by the other members of the drug ring, and by Henry as well. Any slight inconsistencies that Reynolds' statements may have raised would not have been enough to change the outcome, especially where the jury was already presented with information that would call Reynolds' credibility into question. The fact that the jury chose to find Reynolds more credible than Henry, however, was within the jury's province as trier of fact, and would not have been affected had counsel asked Reynolds more questions about what he said to police about the robbery and assault.

{¶ 107} Henry also claims that his counsel was ineffective for asking damaging questions of the state's witnesses and of himself. First, Henry argues that his counsel was ineffective because counsel asked Officer Fedler to confirm that she observed Henry wearing a black shirt and black hat. This question was not damaging to Henry because counsel was

- 28 -

asking Officer Fedler for details about Henry's clothing on the day of the incident as a way to show that Officer Fedler's memory of events, or her observations of details, was incorrect. On direct examination, Henry testified emphatically that he was wearing a red shirt and a red hat, rather than black clothing. The fact that the jury did not find Henry's statement about his clothing to be credible did not render the question to Officer Fedler damaging for any other reason than the jury did not believe Henry's testimony.

{¶ 108} Henry also asserts that his counsel was ineffective for asking Agent Mullis if Henry was listed on the search warrant Agent Mullis obtained to search the Piccadilly complex. Henry asserts that this question was detrimental because Agent Mullis had already established that no evidence linked Henry to the drug ring. However, it was within counsel's trial strategy to reiterate to the jury that at no time was Henry ever linked to the Piccadilly drug ring in a sales or distribution capacity, and Agent Mullis' answer to this question could have further proven that Henry was never suspected by law enforcement to be a part of the drug ring.

{¶ 109} Henry also argues that his counsel was ineffective for asking him during his direct testimony whether a prior charge of intimidating a witness was dismissed by the state before it was ever prosecuted. However, the fact that the state had brought charges against Henry in the past, but did not proceed with the charges could have shown that the state backtracked on a previous charge, and that Henry was charged with a crime he did not commit. Such evidence could have made the jury question whether the state's charges in the current case were wrongfully brought against Henry. The fact that the jury did not find a prior dismissal dispositive of the present case, however, did not render trial counsel's performance deficient or prejudicial.

{¶ 110} After reviewing the entire record, we find that Henry received effective assistance of counsel. As such, Henry's fourth assignment of error is overruled.

**{¶ 111}** Judgment affirmed.


RINGLAND, P.J., and HENDRICKSON, J., concur.